USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

W.W., individually and on behalf of M.C.,

Plaintiff,

-against-

THE NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

12 Civ. 7196 (AT) (HBP)

**MEMORANDUM AND ORDER**

ANALISA TORRES, District Judge:

Plaintiff, W.W., individually and on behalf of her child, M.C., brings this action against the New York City Department of Education (the "DOE") pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq*. Plaintiff seeks review of the May 29, 2012 decision (the "SRO Op.") of New York State Review Officer Stephanie Deyoe annulling the February 23, 2012 decision (the "IHO Op.") of Impartial Hearing Officer Marc Weiner, which found that the recommended goals and program were inadequate for M.C. and directed the DOE to pay for M.C.'s private school tuition. The parties have cross-moved for summary judgment. For the reasons stated below, Plaintiff's motion is DENIED, the DOE's motion is GRANTED and the Court remands two issues to the Impartial Hearing Officer.

## STATUTORY FRAMEWORK

"The IDEA requires New York state to 'provide disabled children with a free and appropriate public education ('FAPE').'" *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (quoting *R.E. ex rel. J.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012)). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." *R.E.*, 694 F.3d at 175. An IEP is a written statement that "'describes the specially designed instruction and

services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child." *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175); *see* 20 U.S.C. § 1414(d) (2012).

The DOE creates an IEP through a local Committee on Special Education (the "CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1) (2013). At a minimum, the CSE is composed of the student's parent(s), a regular or special education teacher, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician and a parent of another student with a disability. *See* N.Y. Educ. Law § 4402(1)(b)(1)(a). Together, the members of "[t]he CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175 (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)).

The CSE does not select the specific school where the student will be placed; accordingly, the IEP does not specify a particular school site. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009). "The [DOE's] practice is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation, or FNR[,] identifying a specific school at a later date." *R.E.*, 694 F.3d at 191. Although a parent may visit the placement listed in the FNR before deciding whether to accept it, "[t]he [DOE] may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP." *Id.* at 191-92 (citing *T.Y.*, 584 F.3d at 420).

If a parent believes that the DOE has breached its obligations under the IDEA "by failing to provide their disabled child a FAPE, the parent may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W.*, 725 F.3d at 135 (citing

*Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993)). If the parent lacks the financial resources necessary to front the costs of private school tuition, the parent may request direct retroactive payment to the private school. *See Mr. & Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 427-29 (S.D.N.Y. 2011).

The process for seeking tuition reimbursement begins when a parent files a due process complaint with the DOE. The due process complaint initiates administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO"). *See M.W.*, 725 F.3d at 135 (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).

> The three-pronged *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c), governs that hearing: (1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them.

*Id.* (footnote and citations omitted). "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379-80 (2d Cir. 2003)); *see* N.Y. Educ. Law § 4404(2). Any party aggrieved by the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court. *See M.W.*, 725 F.3d at 135-36; 20 U.S.C. § 1415(i)(2)(A).

## BACKGROUND

### I. M.C.'s 2010-2011 IEP

M.C. was born in 2003. At the age of four, M.C. entered a public pre-school program at a local church with approximately twenty-two students in the class. Tr. 498. M.C. had previously lived in Ecuador and was placed in a bilingual Spanish/English class for pre-school

and kindergarten. At the beginning of first grade, M.C. was assigned to an English-only classroom due to her preference for English. R. Ex. 4 at 1. According to Plaintiff, M.C. struggled in school, and Plaintiff requested that the DOE evaluate M.C. for the 2010-2011 school year. As of February 2010, M.C. was on a list of students at risk of being required to repeat first grade. Tr. 297-98. The DOE performed several evaluations, R. Exs. 4, 8, 10, 11, and convened a CSE on April 8, 2010 in order to draft an IEP for M.C. R. Ex. 14. The resulting IEP (the "April IEP") categorized M.C. as having a learning disability and recommended a "general education with special education teacher support services ["SETSS"] and related services (counseling)" program. R Ex. 14 at 1. According to the DOE, SETSS entailed removing M.C. from her general education classroom for one period of forty minutes each day and placing her with a special education teacher and a group of six students to address "areas that [M.C.] needed [the] most help in, which would be the reading and the math." Tr. 216. The April IEP also recommended that M.C. attend a counseling session once a week for thirty minutes. R. Ex. 14 at 14. Several weeks after the April CSE meeting, Plaintiff asked that the CSE be reconvened to address her concerns about the April IEP. R. Ex. 15.

On June 4, 2010, the CSE reconvened and drafted a revised IEP (the "June IEP"). According to the minutes of the June CSE meeting, the CSE agreed to change the recommended program from SETSS to collaborative team teaching ("CTT") because "[M.C.'s] progress continue[d] to be very slow in all academic areas and [Plaintiff] fe[lt] strongly that the presence of an additional adult in the classroom, with training in working with children with handicapping conditions, would be most appropriate." R. Ex. 15 at 1. A CTT program involves two teachers, one with a general education license and one with a special education license, co-teaching a mixed class of general and special education students. Tr. 223. Although the student-teacher

ratio on the June IEP was listed as 12:1, this referred only to the special education students, and the class would contain general education students as well. Tr. 117-18. The CSE also revised the goals to be "more measurable," Tr. 224, and the counseling recommendation remained the same.

On June 28, 2010, Plaintiff received a letter from M.C.'s school informing her that M.C. would be required to repeat first grade. R. Ex. H. By letter dated June 30, 2010, Plaintiff requested a third CSE meeting to address several alleged deficiencies in the June IEP. R. Ex. D. In the letter, Plaintiff stated that M.C. had recently received written diagnoses of "chronic autoimmune urticaria and angio[edema]" from M.C.'s allergist and "learning disability . . . specifying Dyslexia with Dyscalculia and Dysgraphia" from M.C.'s pediatrician. R. Ex. D. Plaintiff also informed the CSE that she believed the June IEP was inadequate because M.C. remained at a kindergarten level, could not yet read, but was being asked to repeat first grade without the necessary skills or services. R. Ex. D.

The CSE reconvened at Plaintiff's request on August 18, 2010 to draft a third IEP (the "August IEP"). R. Ex. 1. The August IEP made the same program recommendation as the June IEP, an integrated co-teaching ("ICT") program containing both special and general education students with a 12:1 student-teacher ratio of special education students. As noted by the SRO, "[i]n this case, the terms ICT and collaborative team teaching (CTT) are used interchangeably throughout the hearing record." SRO Op. at 3 n.4. To maintain consistency with the SRO opinion, the Court will also use the term ICT.

The August IEP added an additional session of counseling. R. Ex. 1 at 13. Also added to the August IEP "Health and Physical Development" section was a notation that M.C. has

dyslexia and "chronic autoimmune urticaria and angioedema (chronic hives and swelling)," which can be induced by stress or anxiety. R. Ex. 1 at 7.

II. <u>M.C.'s Identified Placement and Plaintiff's Unilateral Placement</u>

On September 2, 2010, Plaintiff received a Final Notice of Recommendation ("FNR") that M.C. would be placed at P.S. 48. R. Ex. 3. Plaintiff visited P.S. 48 later that month with M.C. to evaluate its appropriateness. R. Ex. G; Tr. 525. According to Plaintiff, the school was very large and "a stressful environment." Tr. 526. The proposed classroom "was a very good size, very colorful, active classroom." Tr. 528. There were twenty-two or twenty-three students in the class with two teachers and two paraprofessionals. Tr. 528. Based on her visit, Plaintiff concluded that the proposed placement was not appropriate because the class was "very crowded," and the teachers utilized teaching methods that "had failed [M.C.], like reading programs, some of the math." Tr. 529.

Plaintiff declined to place M.C. in the assigned school and kept M.C. at home for two months. Plaintiff began investigating other public and private placement options at the end of October. Tr. 538-39. Plaintiff finally chose The Child School, a private school, in November 2010. Tr. 530. According to Plaintiff, The Child School served mostly "high functioning children with learning disabilities." It was better-suited to M.C.'s needs because it had "very small classrooms" with "additional teacher's assistants to be able work one-on-one" with M.C., and it utilized the "Barbara Wilson . . . teaching program for reading for dyslexics." Tr. 530-31. Plaintiff also said that The Child School used "multi-sensory approaches" and "technology," noting that "[M.C.] responds well to technology." Tr. 531.

III. Plaintiff's Due Process Complaint and the Impartial Hearing

On May 23, 2011, Plaintiff filed a due process complaint seeking an impartial hearing in order to obtain a retroactive, direct payment to The Child School for M.C.'s tuition. Plaintiff challenged the August IEP on four grounds: 1) the ICT program was substantively inappropriate and could not meet M.C.'s needs; 2) the August CSE was improperly constituted because the special and general education teachers who participated did not meet the applicable criteria under federal and state law; 3) the goals listed in the IEP were inadequate because they were "ambiguous," "unquantifiable" and did not include short-term objectives; and 4) the proposed placement school was too "large and populous" and would not offer M.C. a "suitable peer group." R. Ex. 12. An impartial hearing was held before IHO Marc Weiner over four nonconsecutive days between September 14, 2011 and January 20, 2012. The DOE called witnesses including Jacqueline Rivera, the DOE psychologist present at the April and June CSE meetings, Este Osofsky, the DOE psychologist present at the August CSE meeting, and Rose Occhino, a DOE social worker. Their testimony touched on several key areas, including whether the recommended program was appropriate for M.C., whether goals of the IEP were appropriate and whether M.C.'s learning disability was properly addressed in the IEP.

A. M.C.'s Recommended Program

Both DOE psychologists testified that ICT was appropriate for M.C. The CSE considered other programs while drafting the IEPs as well. The SETSS program was considered during each CSE meeting but was apparently rejected in the June and August IEPs due to concerns raised by Plaintiff.

Rivera, who attended the April and June CSE meetings, testified that "SETSS would meet [M.C.'s] needs" because M.C. would be pulled out of class once a day to "focus on those

areas that she needs more help in, which it would be you know reading or math. I felt that that would be enough for [M.C.]" Tr. 210-11. When asked why the CSE changed the recommendation in the June IEP from SETSS to ICT, Rivera responded, "[Plaintiff] did not agree with . . . our prior recommendation . . . and [so] we discussed the collaborative team teaching—changing it. We felt that that would also meet [M.C.'s] needs and we . . . made the recommendation together as a team." Tr. 222. Rivera noted that "[both] SETSS or the [ICT] would have . . . met [M.C.'s] needs. It wasn't that being [sic] of a difference, so at the time we didn't have any problem changing the program . . . ." Tr. 223-24. Rivera later added, "I don't [consider ICT more restrictive than SETSS]. I consider it to be sort of very similar." Tr. 242.

Rivera was asked why the CSE rejected a special class (comprised of exclusively special education students) in a community school. She explained, "we have a very bright girl. We have not even tried the least restrictive environment and why would we consider . . . a very restrictive setting? There was just no evidence to support that." Tr. 231. Rivera also explained that the CSE did not consider a twelve-month program because it would have required a more restrictive setting such as a special class and "[t]hat's not what we had in mind at all, so that's why we didn't even consider a [twelve]-month program." Tr. 269. Rivera said that a parent member was not invited to participate in the CSE because the CSE was not "thinking of a more restrictive setting for [the] child." Tr. 242.

Osofsky, who was present only during the August CSE meeting, testified that Plaintiff did not agree with SETSS so the CSE recommended ICT instead, which they discussed for "[a] few minutes." Tr. 93. Osofsky noted that a 12:1 program was discussed but "twelve-to-one indicates that a child is two years below in everything. So I couldn't give [M.C.] [twelve-to-one]. She's not two years below." Tr. 100-01. When asked whether there is a DOE policy that

requires a child to be two years behind before providing a 12:1 classroom, Osofsky responded, "[y]es, pretty much." Tr. 101. Plaintiff's counsel asked Osofsky if M.C. was in fact two years behind given that M.C. tested at a kindergarten level and was repeating first grade, but Osofsky responded, "[M.C.] was going into [first] grade so I didn't score her as two years below." Tr. 156. Plaintiff's counsel also asked Osofsky whether M.C.'s being held back was "influential in terms of what was appropriate," and Osofsky responded, "[n]o." Tr. 156.

The IHO asked Osofsky whether the CSE believed SETSS was the "appropriate recommendation," to which she responded, "I think so, yes," and whether the CSE changed the recommendation to ICT because Plaintiff believed it was not appropriate, to which Osofsky also responded, "[y]es." Tr. 138-39. The DOE's counsel later asked Osofsky why she thought SETSS was appropriate for M.C. Osofsky said, "[w]ell, I don't think it was, in retrospect . . . . It was appropriate for the first time she went around to the [first] grade." Tr. 162.

Rose Occhino, a DOE social worker present for the April and June CSE meetings, testified that ICT was appropriate because "[M.C.] made some very slow and steady progress, it continued to be very slow," and "[Plaintiff] didn't feel . . . that the SETSS program was adequate enough. . . . So we came to a[] consensus that perhaps . . . [the ICT program] would be a good beginning program for her for next year." Tr. 295. When asked to clarify what she meant by a "good beginning program," Occhino said that Plaintiff emphasized M.C.'s poor academic performance and that the CSE "tr[ies] to start with the most conservative program when a child is six and in first grade." Occhino said, "since [Plaintiff] was not willing to accept the SETSS program as adequate and there's a judgment call on what is more adequate SETSS or [ICT]. We went with [ICT] as our beginning program for this child." Tr. 304-05.

B. M.C.'s Goals

The DOE psychologists offered testimony regarding the development of the goals and how they evolved from the April IEP to the August IEP. Regarding the change in the goals from the April IEP to the June IEP, Rivera testified that "[t]hey were made into more—more measurable, so they were changed. It's the same goal. It's just changed as far as how you would measure it." Tr. 224. Osofsky testified that the goals in the August IEP were not changed from the June IEP. Tr. 129.

When asked if the goals in the June IEP addressed M.C.'s dyslexia needs, Rivera said, "we created the smart goals . . . . We recommended that within the goals there's a multi-sensory approach in reading . . . to address her difficulties with decoding, as I say identifying the letter sounds, the letters." Tr. 227. Osofsky agreed that "dyslexic students generally need different goals than students without dyslexia" and testified that a multisensory approach accounted for those dyslexia-specific goals. Tr. 132-33.

Rivera was asked why the goals were not changed between the April and June IEPs but the recommended program was. Rivera explained, "we're looking at the same child. . . . [T]he goals are going to be . . . the same . . . because she hasn't agreed to the service yet. So the goal would be the same because that's what we're concentrating on." Tr. 252-53. Plaintiff's counsel asked Rivera why the CSE believed that M.C. would be able to progress from performing in the first percentile to performing at her grade level in only one year. Rivera said, "[w]ith the support with the service that she needed, with the program that best met her needs, working with the teacher I believe that she could have attained that goal within the year." Plaintiff's counsel asked whether the "program" Rivera was referring to meant SETSS or ICT, to which Rivera responded, "[e]ither or?" Tr. 256.

C. M.C.'s Dyslexia

Another significant area of testimony concerned the extent to which the CSE was aware of M.C.'s dyslexia and whether the CSE properly accounted for it in the IEP. Rivera stated that she was not aware while drafting either the April or June IEPs that M.C. was dyslexic and said that the CSE did not conduct any testing to determine if M.C. had dyslexia. Tr. 259-60. Rivera was also not aware at the time of the impartial hearing that M.C. was dyslexic because she had not seen any documentation. Tr. 259-60. Rivera explained that dyslexia is "a specific learning disability. It hinders the individual's disability [sic] to spell, to read, to write . . . . [T]here's only 13 classifications and learning disability you can have dyslexia is one of them." Tr. 225. The CSE was "not looking at [a specific learning disability.] We're looking [at] whether . . . she [would] qualify for special education services," Rivera said. "She qualifies into a learning disability, whether I did more testing to see—to determine learning disability, no I did not." Tr. 225-26.

Rivera was asked whether a diagnosis of dyslexia would have changed the IEP or the recommended program. She said: "No, it would not have changed. . . . It would have been listed on the IEP under academic performance that she was diagnosed with dyslexia, but the goals would have been the same and the program would have remained." Tr. 271. Moments later, Rivera was asked whether "the needs of children with dyslexia are the same as those with learning disabilities?" Rivera said, "[n]o. . . . A learning disability would be more of a general term and dyslexia is more specific to that." Tr. 274-75. Rivera did agree that children with dyslexia have specific needs. Tr. 275. On cross examination, Rivera explained that M.C.'s dyslexia-specific needs were addressed by the goals in the IEP: "We create goals and the goals that we created were best for a child that has a learning disability and if it was dyslexia, then the

multi-sensory approach would be the best approach with a child with dyslexia," she said. Tr. 275-76.

Osofsky, who attended the August CSE meeting that took place after M.C. had received a diagnosis of dyslexia, said that the IEP did not mention M.C.'s diagnosis but that "[behavior integrated team teaching] should address [M.C.'s] learning disability. We gave her a lot of supports." Tr. 108.[1] Osofsky explained, "[w]e don't use the word dyslexia at the Board of Education. We use the word learning disability. That's the same thing." Tr. 109. When asked whether "everyone who has a learning disability inverts their letters," Osofsky responded, "[n]o, not everybody, but a lot of people do." Tr. 109. Asked by the IHO whether there was anything in the IEP stating that M.C. inverted her letters, Osofsky responded, "[n]o." Tr. 109. Osofsky said that she did not know whether the original drafters of the goals were aware of M.C.'s dyslexia diagnosis. Tr. 134-35.

D. Proposed Placement Class

Ben Upton, a special education teacher at P.S. 48, taught M.C.'s proposed ICT placement class at P.S. 48. He said that there were nine students with IEPs in his class during the 2010-2011 school year and that three of those students were also at a kindergarten level. Tr. 316, 322. In total, there were twenty-six students in his class. Tr. 361. When asked how he would implement M.C.'s needs in the classroom, Upton explained that M.C. would be separated from distractions by being placed in an area in the back of the classroom where a teacher could work individually with her if needed. Tr. 323-24. Upton was asked about how he would work with dyslexic students and said that he would practice letter sounds and handwriting on SMART

[1] The August IEP "Health and Physical Development" section states that M.C. has dyslexia. R. Ex. 1 at 7.

boards to write out, spell and learn words. Tr. 330-31. Upton noted that there were a "few kids who were holdovers last year" and repeating first grade in his program. Tr. 340. Upton said M.C.'s goals "were all realistic goals that could have been met" and that his class could have helped M.C. meet the needs listed in her IEP. Tr. 344-45. On cross-examination, Upton was asked about dyslexic students in his class. Upton said he did not know if they had different needs than other students because "a lot of kids at this age reverse letters." Tr. 349. He said no student from the previous year had dyslexia indicated on his or her IEP. Tr. 349.

IV. IHO Decision

The IHO issued his decision on February 23, 2012. In a winding and bearish opinion, the IHO found that the DOE failed to offer a FAPE for two of the reasons raised in Plaintiff's due process complaint: 1) the goals were inadequate and 2) the ICT program was inappropriate.

A. Inadequacy of Goals

The DOE witnesses had agreed that M.C.'s needs would be met through the goals in the IEP. IHO Op. at 22, 24. The IHO disagreed and found that the goals that were developed in the April IEP to address M.C.'s deficiencies remained "essentially the same" through the August IEP, failing to account for the subsequent developments—that M.C. would have to repeat first grade and was officially diagnosed with dyslexia. *Id.* at 20. Additionally, the goals did not change from the April IEP to the June IEP despite a change in the recommended program. *Id.* at 22. Because the goals did not account for these significant developments, the IHO found that they were inappropriate for M.C. *Id.* at 24. The IHO explicitly rejected as "not credible" the DOE's claim that M.C.'s diagnosis of dyslexia and being held back were irrelevant for assessing the appropriateness of the goals. *Id.* The IHO explained:

> If the recommended program, according to the [DOE's] own witness was not appropriate, then how could the goals written for a teacher and student for that

> program be appropriate? If the same goals written for a general education program with SETSS be [sic] appropriate for a[n] [ICT] program, what is the point in having different goals and different teachers in different programs pursuing a curriculum with goals that can fit any program.

*Id.* at 22. The IHO found that the goals in the August IEP failed to adequately address M.C.'s dyslexia, and he criticized the shared view of the DOE witnesses that M.C.'s general classification as learning disabled adequately accounted for her dyslexia. *Id.* at 24.

B. Inappropriateness of Program

Next, the IHO found that the DOE had a predetermined formula—"learning disabled classification, high average range in intellectual functioning, so let's give her general education and SETSS. Oh parent disagrees, we can move her into [ICT] class"—that was not designed to meet M.C.'s specific needs. *Id.* at 21. In particular, the IHO "[did] not find the testimony of the two DOE school psychologists credible." *Id.* at 24. The IHO questioned whether the DOE psychologists believed that ICT was appropriate given that they stated that either the SETSS or ICT program would have been sufficient for M.C. *See id.* at 20, 24. The IHO also criticized the CSE for changing the recommendation from SETSS to ICT merely because Plaintiff did not want SETSS. The IHO asked, "[d]id they change their original recommendation . . . just to 'get rid of the parent?' Why should this IHO then accept their recommendation that an ICT class would provide sufficient supports?" *Id.* at 24. The IHO said that the ICT recommendation was not appropriate for M.C.'s academic and social needs because "[t]he August IEP lists that the student works best in small groups. A[n] [ICT] class is not a small group. . . . A child who is lost in her own classroom will not survive . . . in a[n] [ICT] class with over twenty-five students, repeating the first grade." *Id.* at 22-23.

C. Remaining *Burlington/Carter* Factors

After finding that the DOE failed to offer M.C. a FAPE under the first prong of *Bulrington/Carter*, the IHO found that The Child School was an appropriate unilateral placement for M.C. because she received the individualized attention she needed and was not anxious at school. The IHO also found that the equities favored the parent. *Id.* at 24-25. The IHO ordered the DOE to pay The Child School for M.C.'s tuition from November 2010 to June 2011.

V. SRO Decision

The DOE appealed the IHO's decision. Plaintiff did not cross-appeal. On May 29, 2012, the SRO issued her decision sustaining the DOE's appeal and reversing the IHO's findings.

First, the SRO reviewed the August IEP and found that it "adequately described" M.C.'s levels of achievement and that the description was "consistent with the evaluative information that was available to the CSE." SRO Op. at 10, 12. The SRO also found that the August IEP accounted for the information provided by Plaintiff, including the diagnoses of chronic autoimmune urticaria and angioedema, dyslexia and depressive disorder. *Id.* at 12.

Second, the SRO found that the goals were consistent with M.C.'s needs throughout the IEPs. *Id.* at 13. Regarding the effect of M.C.'s dyslexia diagnosis, the SRO noted that the CSE was aware that M.C. had symptoms of dyslexia through the initial clinical assessment and that the DOE witnesses testified that a dyslexia diagnosis would not have changed M.C.'s goals. *Id.*

Third, the SRO found that the ICT program coupled with related counseling services was reasonably calculated to allow M.C. to make progress. The SRO cited the testimony of Ben Upton, the teacher of M.C.'s proposed ICT class, and the various methods that Upton described that would have helped M.C. accomplish her goals. The SRO also noted that the evaluative

information used to make the program recommendation was not challenged by Plaintiff and that revisions to the program were made in response to Plaintiff's concerns. *Id.* at 15.

In addition, the SRO found that the ICT program was the least restrictive option for M.C. Noting the requirement under the IDEA that a student be placed in the least restrictive environment, the SRO observed that the CSE followed this command by considering and rejecting other more restrictive options such as a 12:1 placement. In particular, the SRO cited the discrepancy between M.C.'s test scores and her above average intelligence as evidence that the ICT recommendation was appropriate. *Id.* at 15-16.

VI. Appeal to the District Court

On September 24, 2012, Plaintiff appealed the SRO's decision to this Court. Both parties move for summary judgment. Plaintiff argues that she was not required to cross-appeal the IHO's decision because she was not aggrieved by it and that the IEP was inadequate on all four grounds raised in her due process complaint. The DOE argues that the Court should defer to the SRO and that M.C. was not denied a FAPE.

**DISCUSSION**

I. Standard of Review

Although the parties have sought relief by motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)); *see also M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context, therefore, is only a 'pragmatic procedural mechanism for reviewing administrative decisions'") (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam)). "An

IDEA action, however, differs from an ordinary summary judgment motion because the existence of a disputed issue of material fact will not defeat the motion." *J.R. v. Bd. of Educ. of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004) (citing *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003)). Accordingly, "a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact." *Lillbask*, 397 F.3d at 88 n.3. Rather, "[t]he Court in such cases conducts an 'independent judicial review,'" *A.M. ex rel. Y.N. v. New York City Dep't of Educ.*, 12 Civ. 5573, 2013 WL 4056216, at *4 (S.D.N.Y. Aug. 9, 2013) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)), and "base[s] [its] decision[] on 'the preponderance of the evidence,'" *Grim*, 346 F.3d at 380 (citing 20 U.S.C. § 1415(i)(2)(B)).

Although the Court is not required to base its decision on more than the preponderance of the evidence, "it must give due weight to the administrative proceedings [of the IHO and SRO], mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P.*, 554 F.3d at 252 (quoting *Gagliardo*, 489 F.3d at 113) (internal quotation marks omitted). "Thus, [the Court] may not 'substitute [its] own notions of sound educational policy for those of the school authorities [it] review[s].'" *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). The Court is "not to make subjective credibility assessments[] and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who [have] heard the same evidence." *M.H.*, 685 F.3d at 240 (quoting *Grim*, 346 F.3d at 383) (internal quotation marks omitted). In this way, "the role of the federal courts in reviewing state educational decisions

under the IDEA is circumscribed." *Id.* (quoting *Gagliardo*, 489 F.3d at 112) (internal quotation marks omitted); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy.").

When, as here, the IHO and SRO reach conflicting conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H.*, 685 F.3d at 246. "Reviewing courts must look to the factors that 'normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.'" *R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 244). "But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. The court should, therefore, afford more deference to administrative findings that an IEP is substantively adequate, *id.* (citing *Cerra*, 427 F.3d at 195), and to findings "grounded in thorough and logical reasoning," *id.* (citing *Walczak*, 142 F.3d at 129), than to determinations about whether procedure has been properly complied with. *Id.* "[D]eference to the SRO is particularly appropriate where . . . the SRO conducted a thorough review of the entire record that was before the IHO and clearly explained the bases for his [or her] conclusions." *M.W. ex rel. A.W. v. Bd. of Educ. of Enlarged City Sch. Dist. of Middletown, N.Y.*, 12 Civ. 1476, 2013 WL 2631068, at *23 (S.D.N.Y. June 12, 2013).

II. Issues for Review

The three-pronged *Burlington/Carter* test governs petitions for tuition reimbursement under the IDEA. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 242-43 (2009); *see also A.C.*, 553 F.3d at 171. "At the hearing before the IHO, 'the school district has the burden of demonstrating the appropriateness of its proposed IEP.'" *M.H.*, 685 F.3d at 224-25 (quoting *Grim*, 346 F.3d at 379). "[T]he court conducts a review of both the procedural and substantive adequacy of the underlying decision." *A.M.*, 2013 WL 4056216, at *5 (quoting *B.O. v. Cold Spring Harbor Cent. Sch. Dist.*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011)). "At the first step, courts examine whether . . . the state has complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (quoting *Cerra*, 427 F.3d at 192) (internal quotation marks omitted). At the second step, courts examine whether the state's decision "was substantively adequate, namely, whether it was 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Rowley*, 458 U.S. at 206-07). The adequacy of the IEP must be evaluated prospectively, and "both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision." *R.E.*, 694 F.3d at 187.

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (quoting *Walczak*, 142 F.3d at 129). "[H]owever, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim*, 346 F.3d at 381. A procedural violation renders an IEP inadequate only when the violation "'impeded the child's right to a FAPE,' 'significantly impeded the parents' opportunity to participate in the

decision-making process,' or 'caused a deprivation of educational benefits.'" *M.W.*, 725 F.3d at 139 (quoting *R.E.*, 694 F.3d at 190); *see* 20 U.S.C. § 1415(f)(3)(E)(ii).

"'A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement.'" *A.C.*, 553 F.3d at 173 (quoting *Cerra*, 427 F.3d at 195). "Substantive inadequacy automatically entitles the parents to reimbursement." *M.W.*, 725 F.3d at 143 (quoting *R.E.*, 694 F.3d at 190). A school district is not required to furnish "every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199, or "everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (citation and internal quotation marks omitted). Nonetheless, "'the door of public education must be opened in a meaningful way.'" *M.W.*, 725 F.3d at 143 (quoting *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008)).

III. <u>Adequacy of Goals and Recommended Program</u>

The Court begins with the two challenges to the IEP that were reviewed by both the IHO and the SRO. Plaintiff contends that 1) the goals in the IEP were inadequate and 2) the recommended ICT program would not meet M.C.'s needs. Pl. Mem. 19, 26. Plaintiff concedes "the lack of thorough analysis by the IHO" and argues that the Court should conduct a *de novo* review of the evidence to find that the DOE failed to offer a FAPE. Pl. Mem. 10 n.5. This level of review would be inappropriate, as the Second Circuit has stated that "the standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review. In the course of this oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.'" *M.H.*, 685 F.3d at 244 (alterations omitted) (citing

*Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir. 1993)). Because the SRO's opinion is adequately reasoned and therefore deserving of deference, the Court finds that the DOE did not deny M.C. a FAPE on the two issues before it.

A. Adequacy of Goals

Plaintiff urges the Court to find that the goals were inadequate because they failed to target M.C.'s dyslexia and did not account for M.C.'s changing needs. However, the Court notes that "whether a procedural or a substantive issue—the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382; *see P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011) ("Courts have been reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress."), *aff'd*, 526 F. App'x 135 (2d Cir. 2013). The IHO found that the August IEP goals were inadequate to meet M.C.'s needs because they were formulated for the April IEP and did not reflect M.C.'s dyslexia diagnosis, ICT recommendation and need to repeat first grade. IHO Op. at 20-24. The SRO, however, held that the goals were consistent with M.C.'s needs and sufficiently accounted for those facts. SRO Op. at 13-14. The SRO observed that new goals were added and existing goals were made more measurable from the June IEP to the August IEP in response to Plaintiff's concerns. The August IEP goals also properly accounted for the additional information provided by Plaintiff, such as M.C.'s dyslexia diagnosis. *Id.* at 13.

Clearly, the DOE psychologists made confusing statements about the significance of M.C.'s dyslexia diagnosis. However, "the law is clear that school districts are not required to classify a student in a particular category." *M.H. v. New York City Dep't of Educ.*, 10 Civ. 1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) (citing 20 U.S.C. § 1412(a)(3)(B)). The

absence of an explicit mention of dyslexia in the goals is not fatal to the IEP because, as explained by the SRO and the DOE psychologists, the goals were adequately designed to address M.C.'s learning challenges, which include not only dyslexia but also dyscalculia and dysgraphia, *see* SRO Op. at 13-14; *see also* R. Ex. D (Plaintiff's June 30, 2010 letter indicates that M.C. had received a written diagnosis of "learning disability . . . specifying Dyslexia with Dyscalculia and Dysgraphia"), and the Court is not qualified to second-guess these educational experts' opinions. Accordingly, the Court defers to the SRO's conclusions regarding the appropriateness of the goals for M.C. *See M.C. v. Katonah/Lewisboro Union Free Sch. Dist.*, 10 Civ. 6268, 2012 WL 834350, at *6, 10-12 (S.D.N.Y. Mar. 5, 2012) (deferring to SRO's finding of adequate goals for a student with dyslexia based on DOE witness testimony); *M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 508-09 (S.D.N.Y. 2008) (deferring to an SRO's finding that the IEP included "measureable annual goals" based on evaluations and testimony from a DOE witness).

B. Adequacy of ICT Program

The IHO found that the ICT program "was not appropriate given [M.C.'s] individual health and academic history" and that the DOE "threw [M.C.] into a program and then changed the program when there was a complaint of insufficiency." IHO Op. at 24-25. The SRO reversed, finding that the ICT recommendation was appropriate based on the description of M.C.'s performance in the August IEP, the evaluative information available to the CSE and Plaintiff and the changes made to the IEP in response to concerns and information from Plaintiff. SRO Op. at 14-15. The SRO cited special education teacher Ben Upton's testimony about the teaching methods he would employ in his classroom to accomplish M.C.'s goals, such as the use of small reading groups, phonics instruction, positive reinforcement and practice techniques like

tapping out sounds and using the SMART board. *Id.* Here, as with the goals, the Court must defer to the SRO's conclusions.

Plaintiff argues that the SRO cannot rely on Upton's testimony because it is impermissibly retrospective, Pl. Mem. 16-18, but Upton's explanation of his classroom techniques is appropriate to the extent it explains how the goals and services in the IEP would be realized. *See R.E.*, 694 F.3d at 186 ("While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP."). For example, when asked how he would meet M.C.'s need for a "multi-sensory approach when presenting directions, explanations, and instructional content," R. Ex. 1 at 4, Upton explained, "we'll verbally explain directions to the kids. . . . [W]e have it written down on the dry erase board or on the SMART board . . . . [W]e'll have another student . . . repeat the directions for the kids so we know that somebody else heard it as well." Tr. 325-26. This testimony is permissible under *R.E.* because it explains how the DOE would meet the need listed in the IEP. Plaintiff also contends that the DOE offered no evidence to support the program's appropriateness, but the SRO cited testimony from Upton as well as the DOE psychologists to support her conclusions. SRO Op. at 14-15. In addition, the SRO relied on evaluations provided to the CSE and the changes from the June IEP to the August IEP to find that the ICT recommendation was designed to confer educational benefits. *Id.* at 15. Plaintiff's argument that the DOE provided no evidence regarding the appropriateness of the ICT program is, therefore, without merit.

Finally, Plaintiff claims and the IHO agreed that the ICT program would not meet M.C.'s needs for multiple reasons such as the large class size, the potential for distractions and lack of children with similar needs. However, the Court is ill-equipped to assess these claims of

inadequacy raised by Plaintiff. The Court cannot "cho[o]se between the views of conflicting experts on a controversial issue of educational policy—effective methods of educating dyslexic students—in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *Grim*, 346 F.3d at 383 (citing *Rowley* 458 U.S. at 207 n.29). Whether an education program such as SETSS or ICT is appropriate for a particular student is a question best left to the educational authorities. Plaintiff concedes that the IHO's opinion is not a thorough analysis. Pl. Mem. 10 n.5. The Court is obligated, therefore, to defer to the SRO on this issue. *R.E.*, 694 F.3d at 189 ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case *a better-reasoned* IHO opinion may be considered instead.") (emphasis added); *J.A. v. New York City Dep't of Educ.*, 10 Civ. 9056, 2012 WL 1075843, at *10 (S.D.N.Y. Mar. 28, 2012) (The SRO is entitled to deference "as a state agency's final determination on questions within its peculiar expertise, including the adequacy of classroom staffing, the number of students to be placed in a classroom, and the educational supports necessary to address the student's specialized needs.") (citing *Walczak*, 142 F.3d at 129).

IV. Remaining Issues

Although the IHO found in favor of Plaintiff on two of the four issues raised in Plaintiff's due process complaint, neither the IHO nor the SRO addressed Plaintiff's remaining arguments that the CSE was improperly constituted and the placement school was too large and populous. The SRO had held that Plaintiff waived her right to assert these claims by failing to cross-appeal the IHO's decision. SRO Op. at 9. Plaintiff maintains that she could not cross-appeal because she was not aggrieved by the IHO's decision and asks that the Court decide the remaining issues rather than remand. Pl. Mem. 10-13.

The Court agrees that Plaintiff was not obligated to cross-appeal the IHO's decision because she was not aggrieved by it. *F.B. v. New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 587-89 (S.D.N.Y. 2013) (explaining why plaintiffs were not obligated to cross-appeal issues not addressed by IHO in a decision in their favor). However, without prior guidance from the state administrative authorities, the Court declines to decide these two remaining issues at this time and remands to the IHO to decide in the first instance. *J.F. v. New York City Dep't of Educ.*, 12 Civ. 2184, 2012 WL 5984915, at *10 (S.D.N.Y. Nov. 27, 2012) (remanding to IHO when neither IHO nor SRO had reviewed remaining issues); *see F.B.*, 923 F. Supp. 2d at 589 (remanding issues not cross-appealed from favorable IHO decision back to SRO to address); *D.N. v. New York City Dep't of Educ.*, 905 F. Supp. 2d 582, 588-89 (S.D.N.Y. 2012) (same).

**CONCLUSION**

With regard to the two grounds raised in Plaintiff's due process complaint and reviewed by both the IHO and the SRO, Plaintiff's motion for summary judgment is DENIED and the DOE's motion is GRANTED. The Court remands the two unaddressed grounds to the IHO for proceedings not inconsistent with this opinion.

The Clerk of Court is directed to terminate the motions at ECF Nos. 19 and 21 and to close the case.

SO ORDERED.

Dated: March 31, 2014
New York, New York

ANALISA TORRES
United States District Judge